142 So.2d .885

**Sam A. FIORELLA**

v.

**STATE.**

**7 Div. 508.**

Court of Appeals of Alabama.

Aug. 18, 1959.

Rehearing Denied Sept. 15, 1959.

Gibson & Hewitt, Birmingham, and Wales W. Wallace, Jr., Columbiana, for appellant.

John Patterson, Atty. Gen., and Paul T. Gish, Jr., Asst. Atty. Gen., for the State.

PRICE, Judge.

The defendant was convicted of being a vagrant, as defined in subsection 11 .of Section 437, Title 14, Code of Alabama 1940, in that, "he was the keeper · or proprietor of a gambling house, * * *."

The house was described as a house situated in Shelby County, Alabama, located west of the old Birmingham-Montgomery paved highway, and being the first house south of the Cahaba River, said place having been formerly known as the "McCoy place."

Carl Crump, a police officer of Columbiana, testified that in 1955 he had a deputy's commission for Shelby County. Around the first part of December he went to the old McCoy or Fiorella place about 10:30 at night. The house had a main floor, a basement and an upstairs. In the upstairs room he saw and examined a pool or billiard table. There were no pockets in the table for balls to fall into. The table was clean. He found some pool or billiard balls in the cashier's cage. They were at the bottom of a drawer in the counter. The balls were covered with heavy dust.

Herbert Pool testified he had delivered mail as a substitute carrier for three years on Helena Route 1. He knew the house commonly called the old McCoy place and had occasion to deliver mail to Box 38, the box serving that house. Within a twelve-month period prior to January

24, 1956, he delivered mail to that box addressed to Sam Fiorella. The box is about a block from the house, at the entrance to the highway. He never personally delivered any mail to Mr. Fiorella. He did not recall delivering mail to other named persons in that box, and did not recall delivering any mail to Jack Fiorella. He did not deliver mail to Mr. McCoy. Mr. McCoy died in 1951. He was never at the house and never had seen Mr. Fiorella there.

The house and the premises were described by Mr. Hugh Sims, Sheriff of Shelby County, as follows: The driveway leaves old 31 and goes back due west almost to a large house in the edge of the woods. At the entrance, which is approximately one hundred feet from the corner of the house there is a block wall built up, beginning at the driveway, three and a half or four feet high and continues around in an L shape on the north and west sides of the house. The land is lower there and the wall on the lower corner is twelve or thirteen feet; room for parking forty or fifty automobiles.

The house has a main floor. From the front on the side of the hill it has a basement on the back. It has an entrance on the main floor. There is a large dining room on the back and on the north there is a kitchen and a small breakfast room. To the left as you enter there is a room the furnishings of which consisted mainly of an office desk and chair. Adjoining that on the west side of the same room there is a bedroom with a double bed and clothes hanging in it. From the main entrance to the living room in front is the stairway leading to the upper floor. At the top of the stairs there is a door opening into one large room. Along the south wall of this room there was a billiard table. There were six window openings in this room, all of which were covered. In the northwest corner of the room there was a cashier's cage, which contained drawers and storage space under it. In the basement there was a wire enclosure containing soft drink bottles and several cases of drinks. Separate rest rooms for men and women, with neon signs on them, were in the house.

The Sheriff testified he had been to the house on more than one occasion when Mr. Fiorella was there, and when there were from 8 to 20 persons present, but he never saw any gambling going on.

Shortly before midnight on January 24, 1956, a raiding party, consisting of the Attorney General and some members of his staff, four highway patrolmen, Sheriff Sims and several other persons went to the house. The first floor entrances had steel and iron grill doors, and there were padlocks in the hasps.

The officers were admitted to the house by a white man named Burt Kendrick. The only people in the house were Kendrick, another white man named Hardin, a Negro man named Jack Lowe, and Dorothy Battle, a Negro woman. No gambling was taking place at the time of the raid. Sam Fiorella, the defendant, came to the house some fifteen or twenty minutes after a telephone call was made by Kendrick. He unlocked the office door. There were poker chips in plastic boxes stacked in the corner, and two felt-bottom wooden trays with poker chips in them. A deck of playing cards was found in the pocket of a coat hanging in the bedroom closet. A box of cards with the name "Happydale Farm Home Bred Cattle", and a sketch from Highway 31, around the old 31 at the location of the old McCoy home, were in the desk.

The billiard table in the upstairs room was raised on blocks and there was a small wooden platform on either side of the table. The table was clean. There were pool or billiard cues but no billiard balls. The windows were covered on the inside with heavy paper and curtains covered the paper.

There was an electrical address or loud speaker system installed in the house. There was a drink box in the dining room and twelve to twenty cases of drinks in

the basement. In a room to the right of the front entrance there was a round table which looked like a breakfast room table, with chairs. The table was covered with a green felt-like cloth over which there was a white cloth.

Two of the witnesses testified they heard defendant say to Jack Lowe just before and at the time he was being questioned by the officers, "you don't remember a thing."

Several photographs portraying certain objects in the house were introduced in evidence and appear in the record. Two sticks, one described as about four feet long, and the other about thirty inches to three feet in length, each of which had a right angle turn at the end, approximately three and one half inches long beyond the right angle turn, were introduced in evidence.

Hugh Chambliss, a Birmingham police officer, testified he was not at the house on January 24th. He stated he had visited many gambling houses in Alabama and elsewhere, and had been present at such places when there was crap shooting and poker playing, and knew how it was played. He was familiar with the duties of the people operating the table and the manner in which bets are placed. The chips, trays, table and sticks shown in the state's exhibits are of the kind ordinarily and customarily used in the operation of a gambling game. The chips are used as a representation for money. The stick is known as a dice rake, used for raking dice and chips from one end of the table to the other. The witness explained to the jury in detail the use of such a table, stands, sticks and chips in the operation of a dice game.

Herman Evers, Jr., a Birmingham police officer, testified that on the night of the 28th or 29th of March, 1955, between the hours of nine and ten p. m., he went to the Fiorella place in Shelby County. Cars were parked at the house. The witness stated to the man who came to the barred door that he had been told he could come there and engage in games, such as dice and poker playing. The man said they were out of business at that time and told him to return in about thirty days. He did not personally know the person who spoke to him.

On cross examination Sheriff Sims testified he had seen the house many times. When Mr. McCoy used to be living up there, he had been there on a few occasions. The house was there before Mr. McCoy died and the wall that would obscure cars from the highway was built during Mr. McCoy's lifetime. He didn't know anything about the interior, but the grill and iron screen on the outside doors was there when Mr. McCoy was there. Insofar as the external appearance is concerned, the night the officers were there, it looked just like it looked during Mr. McCoy's lifetime. Mr. McCoy operated under the corporate name of Beverly Club, or at least it was generally known as the Beverly Club from newspaper reports. The initials of Beverly Club is B. C. and in the picture, by the race horse, are words Beverly Club. There was a kitchen and facilities to cook meals. He saw no cows or cattle there that night. He had seen a few beef cattle, but didn't remember horses. This old stick was broken but it was hanging together and the tape was on it at the time, except the other tape he put on it at his office. He has never seen any gambling going on at the house.

W. E. Baldwin, Division Auditor for Alabama Power Company testified he had the order initiating service in November, 1952, carried in the name of Jack Fiorella, Route 1, Box 38, Helena. Service was terminated July 25, 1956. He had not checked the equipment and couldn't say whether the house was air-conditioned, or whether there was a pump that pumped water for cattle.

J. L. Switzer testified he was manager of the Southern Bell Telephone and Telegraph Company for that area. The records of services rendered or toll charges are

kept under his supervision. He had records that apply to an installation for a customer named Sam Fiorella in Shelby County. Monthly charges for telephone service beginning June 1, 1955, through January, 1956, were testified to by the witness. The installation was made March 25, 1953, and terminated July 14, 1956.

The witness, Joe Tortomasa, testified he knew Sam Fiorella and Jack Fiorella. They are brothers. Witness and Leon Tomasino rented to Sam Fiorella the property known as the old McCoy place in Shelby County.

The defendant did not testify and offered no evidence in his behalf.

■ At the conclusion of the State's case the defendant's motion to exclude the evidence was overruled. The general affirmative charge requested by defendant was refused by the court, and motion for new trial on the ground of the insufficiency of the evidence to sustain the verdict was denied. These rulings are insisted upon as error, upon the theory that no proof was offered tending to show that there was any gambling going on or that anyone was operating a gambling house at the old McCoy place within the time embraced in the indictment. Furthermore, that the evidence failed to show that appellant was the owner or proprietor of such a place. Appellant's counsel cites Martin v. State, 2 Ala.App. 175, 56 So. 64, 65. In that case the defendant was charged with "keeping, exhibiting, or being connected in keeping or exhibiting a gaming table for gaming." The court said, "The main inquiry for the court and jury has reference to the use for which the table was kept or exhibited, for it is the use that characterizes its criminality." This, and other similar statements in the opinion are relied on by appellant as authority for his contention that the state was required to prove that the equipment in the house was used for gambling.

It will be noted that in the Martin case the defendant was charged, under the statute, with keeping, etc., "a gaming table for gaming." The court said: "Any table *kept and used for gaming,* has been held by the Supreme Court to be a table for gaming within the meaning of the statute." (Italics supplied.)

In 38 C.J.S. Gaming § 94, p. 155 it is said: "To render a person guilty of the common-law offense of keeping a common gaming house or room, it is not necessary to show that any gambling was in fact done there, as the offense consists in the keeping of the place for such a purpose. The same is true, in the absence of express provision to the contrary, under statutes punishing the keeping of a gaming house or place, etc., or the keeping or exhibiting of a gaming table or other device."

In Hurvich v. State, 230 Ala. 578, 162 So. 362, a gambling device was held subject to condemnation and destruction, although not in use for gambling purposes. The court construed the applicable statute as intended to prohibit ownership or possession of gambling devices, whether actually used for gambling purposes or not.

To like effect is the decision of this court in Agnesia v. State, 35 Ala.App. 264, 45 So.2d 712. See also Annotation "Possession of gambling device as offense not requiring showing that device was used for gambling or kept for gambling purposes." 162 A.L.R. 1188.

We are of opinion that to establish that a certain house was maintained or kept as a gambling house would not require direct evidence of actual gambling, but could be determined from a consideration of all the circumstances shown by the evidence.

The evidence was sufficient to go to the jury and to sustain the conviction as to the questions of whether or not the house was a gambling house and whether or not the defendant was the keeper or proprietor of it. The court's rulings on the motion to exclude the evidence, request for affirmative charge and motion for a new trial were without error.

■ This question was asked Sheriff Sims:

"Q. Isn't it a fact, Sheriff, that cars parked behind the concrete block wall to which you have testified would be out of view of the highway?"

Objection was made on the general grounds and on the ground that the question called for a conclusion of the witness.

The Sheriff answered: "On the lower side of the lot they could not be seen from the highway." This was admissible as a statement of fact and was not a conclusion. Moulton v. State, 19 Ala.App. 446, 98 So. 709.

■ State's witness Evers stated he went to the house in March of 1955, but was not admitted. The court permitted the witness to testify he told the man on the inside of the barred door that he had been told he could come there and engage in games, such as dice and poker playing and the man at the door replied they were out of business at that time, and for him to return in approximately thirty days.

The questions eliciting this testimony were objected to on the ground the conversation was out of the presence of defendant and was hearsay.

Before allowing the witness to testify the court instructed the jury the evidence was admitted solely for the purpose of shedding light on the character of the house and not for the purpose of showing who was the operator of the place.

We have not been cited to nor have we found an Alabama case determinative of the question presented. The general rule is that in a prosecution for keeping a gambling house, house of ill fame, or the like, evidence of the acts and sayings of persons within the place complained of are admissible to establish the character of the house, whether or not the alleged keeper was present, "because in a sense it may be said that the conduct and con-

versation of the inmates is the res gestae of the business there being conducted and reflects the character of the house", Dossett v. State, 93 Tex.Cr. 41, 245 S.W. 439. But such language, unless used in the hearing of the defendant, must be of itself disorderly, or must be used in connection with acts which together with the language exhibited disorderly conduct. 27 C.J.S. Disorderly Houses § 14, p. 330; Bindernagle v. State, 60 N.J.Law 307, 37 A. 619; State v. Sweet, 81 N.J.L. 250, 79 A. 1054.

In State v. Sweet, supra, the court said the language of one of the inmates of defendant's house in soliciting persons within the house to make appointments for future meetings elsewhere for vicious purposes, would be admissible for the purpose or proving the character of the house.

We are of opinion the suggestion of the person inside the house that the witness Evers return to the premises at a later date in response to the question concerning gambling at the house was admissible, irrespective of whether defendant was present or not.

■ It is claimed the court erred in sustaining the State's objection to this question propounded to Sheriff Sims on cross examination: "Q. Mr. McCoy had the reputation of being a gambling man, didn't he?" It is argued that if the gambling paraphernalia found in the house belonged to Mr. McCoy, who ran the Beverly Club, and was not used by appellant, the fact that it was in the house would not be a violation of the law, and that it is always proper for accused to show, by direct or circumstantial evidence, that a third party committed the offense.

There is no merit in this contention for several reasons: 1. The inquiry was not framed as to the ownership of the property. 2. The charge was the keeping of a gambling house. To sustain such charge it is not required that defendant own the equipment. 3. The charge against de-

fendant was a misdemeanor, every act of which must be shown to have occurred within twelve months preceding the indictment. Griggs v. State, 19 Ala.App. 517, 98 So. 490. The evidence showed Mr. McCoy died in 1951. Proof that another owned and operated the premises as a gambling house prior to the period covered by the indictment could avail defendant nothing.

It is argued that the court erred in sustaining the state's objection to the following question propounded to state's witness Sims: "Q. Now, Mr. McCoy operated, did he not, under a corporate name of Beverly Club of some sort?"

We set out the following excerpt from the record to illustrate our view that the witness answered the question:

"Q. Now, Mr. McCoy operated, did he not, under a corporate name of Beverly Club of some sort?

"By Mr. Fowler: We object to that, may it please the Court, to any operation of Mr. McCoy.

"By the Court: Sustain the objection.

"By Mr. Wallace: We except, Your Honor, and show to the Court that State's Exhibit "A" they have here in broad letters here, The Beverly Club, which was the club of Mr. H. M. McCoy and which can be shown by the records in this court house.

"By Mr. Fowler: May it please the Court the testimony before the jury is Mr. McCoy died in 1951 and this picture was taken in 1956.

"By the Court: Yes, sir, but the picture is in though, and if it has got that on it.

"Q. Now, that is right, isn't it, Mr. Sims, that Mr. McCoy operated under the corporate name of Beverly Club, or at least it was generally known as Beverly Club? A. Generally known from newspaper reports etc.

"Q. And the initials of Beverly Club is B. C., is it not? A. I presume it is.

"Q. And pictured here by this horse race here (indicating) is the word, Beverly Club (indicating)? A. I presume it is."

■■■■ Charge 19 is as follows: "19. Unless the Jury are satisfied from the evidence, beyond a reasonable doubt, and to a moral certainty, that the house where the game was alleged to have been played was a public place, they must find the defendant not guilty."

The charge was refused without error. There was no evidence that a game was played, therefore, the charge is inapplicable to the evidence and is abstract. Furthermore, the proper hypothesis for a requested charge in a criminal case is "if the jury 'believe from the evidence.'" Wesson v. State, 251 Ala. 33, 36 So.2d 361.

■■■ When state's witness Tortomasa was called to the stand, the court, on motion of defense counsel advised witness of his constitutional privilege to refuse to answer questions which would elicit evidence tending to incriminate him. This took place out of the jury's presence. Defense counsel requested the solicitor to indicate the nature of proposed questions to the witness. During the colloquy that followed, the solicitor stated the one-year statute of limitation would have run against any charge against the witness for leasing property for gaming purposes, and the only other fact expected to be proved by the witness was that Jack and Sam Fiorella were brothers. Defense counsel stated there was one indictment against defendant which charged a felony, with reference to a communication device, against which the statute of limitations would not have run. The jury returned to the courtroom. The witness testified Jack and Sam Fiorella were brothers. Thereupon this question was asked: "Q. I will ask you to state whether or not you and Mr. Leon Tomasino had heretofore rented to Sam Fiorella the property known as the old McCoy place in Shelby County?"

Defense counsel objected on the ground this was the question considered in the absence of the jury and it was counsel's understanding it was not to be propounded.

The solicitor remarked the witness had testified before the grand jury concerning these matters. Defense counsel moved for a mistrial on account of the solicitor's statement. The court said: "I deny your motion, but gentlemen of the jury, that is not evidence and not to be considered by you. Anything, any remark said by the attorneys representing either side is not evidence—you are not to consider any remark by counsel to the court."

The solicitor explained to the court that he made the statement because the law says a person who testifies before a grand jury concerning matters is immune from prosecution, and since the witness did testify before the grand jury he is immune from prosecution.

Defense counsel renewed his motion for a mistrial "by reason of the solicitor's continued and repeated statements in the hearing and presence of the jury to the effect that the witness has testified before the grand jury." The court said: "I deny your motion and instruct the jury that was to the court."

It is argued that the foregoing discussion with reference to the state's witness having testified before the grand jury entitled appellant to a mistrial. We do not agree with defendant's contention that the rights of defendant were so prejudiced by the solicitor's remarks as to render a fair trial a matter of grave doubt. The court did not abuse its discretion in refusing to order a mistrial. Dunnaway v. State, 36 Ala.App. 171, 56 So.2d 356, certiorari denied 256 Ala. 641, 56 So.2d 358; Hayes v. State, 225 Ala. 253, 142 So. 675.

There was no error in allowing the sheriff to testify that an object portrayed in one of the photographs introduced in evidence "is a device which you

can speak through." The witness stated that talking in another room was audible through this speaker system. Carter v. State, 4 Ala.App. 72, 59 So. 222.

It is insisted that the court erred in overruling objections to questions propounded to witnesses Rhinehart and Freeman eliciting testimony as to defendant's remark to the Negro, Jack Lowe, "You don't remember a thing." Appellant argues the alleged statement is not a part of the res gestae, and there was no proof on the part of the state that the alleged statement of defendant to Lowe was voluntary.

"The acts, declarations, and demeanor of an accused, before and after the offense, whether a part of the res gestae or not, are admissible against him, but unless a part of the res gestae are not admissible for him." Willingham v. State, 261 Ala. 454, 74 So.2d 241, 244. See also Johnson v. State, 265 Ala. 360, 91 So.2d 476.

The statement attributed to defendant was not a confession, or admission in the nature of confession, of actual guilt, but is of the class of inculpatory admissions for which no predicate of voluntariness is required to render them admissible. Read v. State, 195 Ala. 671, 71 So. 96.

The qualification of a witness to testify as an expert is a matter addressed largely to the discretion of the trial judge. Richardson v. State, 37 Ala.App. 194, 65 So.2d 715; Alexander v. State, 37 Ala. App. 533, 71 So.2d 520; Willingham v. State, 261 Ala. 454, 74 So.2d 241.

The witness Chambless was shown to have been a member of the Birmingham police force for almost seven years. A part of that time he was assigned to the vice detail to investigate gambling. He had assisted in raiding gambling places, and had many times observed gambling games at places in Alabama and elsewhere. We think the trial judge did not abuse his discretion in this instance.

"Evidence which is material to some issue in the cause and tends to elucidate it is admissible." Parvin v. State, 248 Ala. 74, 26 So.2d 573, 574. The evidence of the witnesses Baldwin and Switzer relative to electricity and telephone bills was material to the issue of the character of the house, and the fact that the electric bill was carried in the name of Jack Fiorella did not render such evidence inadmissible.

Defense counsel objected to the argument of the solicitor, "that is a gambling house and let's close it down", on the ground the evidence shows it was leased to the American Oil Company. The objection was overruled. There was no error in this ruling. The solicitor is allowed to point out inferences which he thinks are properly drawn from the evidence. Beaird v. State, 219 Ala. 46, 121 So. 38; Carroll v. State, 36 Ala.App. 59, 52 So.2d 171; Johnson v. State, 35 Ala. App. 645, 51 So.2d 901.

No reversible error appears in the record. The judgment is therefore ordered affirmed.

Affirmed.